KENT COUNTY PROSECUTOR v KENT COUNTY SHERIFF ·

Docket No. 74055. Argued December 18, 1985 (Calendar No. 10).
    Decided August 7, 1986. Rehearing granted 426 Mich 1201.

On May 12, 1983, the Kent County Sheriff declared an over-
crowded state of emergency for the Kent County jail as author-
ized by the county jail overcrowding act (1982 PA 325). The
Kent County Prosecutor brought an action in the Kent Circuit
Court against the sheriff, seeking a declaration that 1982 PA
325 was unconstitutional, a preliminary injunction to prevent
the release of prisoners under the act for the duration of the
lawsuit, and an injunction to preclude the sheriff from releas-
ing prisoners prior to the expiration of their sentences. The
Kent County Office of the Defender was permitted to intervene
as a defendant. The court, George V. Boucher, J., denied the
plaintiff's motion for a preliminary injunction, and upheld the
constitutionality of the act. The Court of Appeals, R. B. BURNS,
P.J., and D. E. HOLBROOK, JR., and TAHVONEN, JJ., reversed in
an opinion per curiam, holding that the act was unconstitu-
tional because it usurps the Governor's exclusive power of
commutation of sentences (Docket No. 72805). The defendants
appeal.

The decision of the Court of Appeals was affirmed by equal
division.

Justice BOYLE, joined by Justices BRICKLEY and RILEY, stated
that the county jail overcrowding act is unconstitutional. The
Governor's power of commutation is exclusive, and there is no
constitutional grant of power to the Legislature over determi-
nate sentences.

1. The county jail overcrowding act provides for early release
of prisoners serving jail sentences when the jail population
exceeds a certain percentage of rated design capacity. While
the Legislature normally is afforded plenary power over mat-
ters dealing with the public health and general welfare of the
people, the power of commutation is granted by the constitu-
tion solely to the Governor. Any law restricting the power,
thus, is unconstitutional and void.

2. Although application of the prison overcrowding act could
result in a reduction in the length of indeterminate prison

sentences, that act was held constitutionally permissible because the constitution specifically grants the Legislature the power to provide for indeterminate sentences and for the detention and release of persons imprisoned under such sentences. Jail sentences, however, are not indeterminate; they are for a fixed and determinate amount of time. Therefore the grant of power to the Legislature over indeterminate sentences properly may not be applied with respect to the county jail overcrowding act to avoid infringement upon the Governor's commutation power. Commutative power over determinate sentences is not within the specific powers granted the Legislature under the constitution, and the county jail overcrowding act, which operates to commute determinate sentences thus is unconstitutional.

3. Commutation need not be an act of individual clemency. In addition, it cannot be said that the process mandated by the county jail overcrowding act does not involve individual clemency. Prisoners are reviewed individually by name, offense, length of sentence imposed, date on which the serving of the sentence began, date of release, and the name of the sentencing judge. Individual determinations are then made, on the basis of an assessment of the risk involved, whether the sentence should be reduced. This is a commutation in every sense of the word.

Justice LEVIN, joined by Chief Justice WILLIAMS and Justice CAVANAGH stated that the county jail overcrowding act does not contravene the Governor's commutation power.

1. The county jail overcrowding act requires a county sheriff, if approved by a majority of judges within the county and county officials, to declare a jail overcrowding state of emergency where the population of a county jail exceeds one hundred percent of its rated design capacity for seven days. Where the sheriff and judges within the county are unable to reduce the population to ninety percent of capacity within fourteen days, the chief circuit judge is required to classify the prisoners as high or nonrisk and determine the maximum and minimum amounts by which their sentences may be reduced. Thereafter, the sheriff must reduce the sentences of nonrisk prisoners within that range. Following these actions, if the population remains above ninety percent twenty-eight days after the declaration, the sentences of all prisoners must be reduced by the sheriff up to thirty percent so as to reduce the population to ninety percent of capacity. The provisions of the act are modeled on similar provisions of the Prison Overcrowding Emergency Powers Act which was held to be constitutional and not

violative of the Governor's authority under the constitution to commute sentences.

2. All sentences to a county jail are for one year or less; and all such sentences imposed after the effective date of the county jail overcrowding act are indeterminate to the extent that the Legislature has empowered the sheriff and judges to reduce the sentences. The power to reduce the sentences is essentially the same as that conferred on the parole board. Not every shortening of a sentence is a commutation. Reprieve, pardon, and commutation are acts of individualized clemency. Reduction of sentences under the provisions of the county jail overcrowding act, while having consequential similarities to commutation, results from the exercise of a wholly different kind of governmental power.

3. The Legislature has the power to designate grades of criminal offenses, to prescribe penalties for their commission, to determine the length of imprisonment, and to alter established rules of criminal responsibility. The early release provisions of the county jail overcrowding act employ generalized criteria not designed to reduce the length of time served by a particular offender or class of offenders. The potential for sentence reduction under the act does not involve factors that would be considered by a judge in imposing a sentence. Rather, reduction depends primarily on the occurrence of overcrowding for a set period of time. Individual review occurs only insofar as the sheriff presents to the chief circuit judge factual information about the prisoners in the county jail for classification as high or nonrisk. Any general mercy which results is incidental to the primary goal of relieving overcrowding, a goal within the plenary power of the Legislature. The power of the Governor to grant commutation, reprieve, or pardon is not exclusive. Powers of the Legislature with respect to sentence reduction may overlap. The county jail overcrowding act does not infringe upon the Governor's power of commutation.

4. The Legislature has the duty to regulate the public health and general welfare of the people. The constitution contemplates that the duty will be accomplished by the passage of suitable laws or emergency statutes under the police power. The county jail overcrowding act furthers the public health of the state's jail population. It was a response to a serious, immediate problem enacted following investigation and hearings concerning a recurrent problem in many county jails which endangered the physical well-being of persons incarcerated by increasing the risk of infectious diseases and increased

susceptibility to diseases due to stress caused by crowding, and which heightened the potential for prison riots and disruptions. Affirmed.

Justice ARCHER took no part in the decision of this case.

133 Mich App 611; 350 NW2d 298 (1984) affirmed.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *David H. Sawyer,* Prosecuting Attorney, and *Timothy K. McMorrow,* Chief Appellate Attorney, for the plaintiff.

*Varnum, Riddering, Schmidt & Howlett* (by *Jon F. DeWitt* and *Jonathan W. Anderson*) for the defendant.

Kent County Office of the Defender (by *Michael P. Mathews* and *Richard E. Hillary*) for intervening defendant.

BOYLE, J. In this case, we consider the constitutionality of the county jail overcrowding act, MCL 801.51 *et seq.;* MSA 28.1748(1) *et seq.,* which allows for the early release of prisoners serving jail sentences when the jail population exceeds a certain percentage of rated design capacity.[1] The

---

[1] The pertinent part of the county jail overcrowding act, § 6, provides:

If the actions taken pursuant to section 5 do not reduce the county jail's population to 90% of rated design capacity or a percentage of rated design capacity less than 90% as set by a court prior to the effective date of this act within 14 days of the declaration of the county jail overcrowding state of emergency, the sheriff shall present to the chief circuit judge for the county in which the jail is located the following information for each prisoner sentenced to and housed in the county jail on that date:

(a) The name of each prisoner.

(b) The offense for which the prisoner was convicted.

(c) The length of sentence imposed for the prisoner.

(d) The date on which the prisoner began serving his or her sentence.

(e) The date on which the prisoner will be released from the

Legislature is afforded plenary power over matters dealing with "[t]he public health and general welfare of the people of the state . . . ." Const 1963, art 4, § 51. In addition, as this Court stated in *In re Brewster St Housing Site,* 291 Mich 313, 333; 289 NW 493 (1939):

> In passing upon the constitutionality of State legislation, it is necessary to point out in the Constitution of the State the limitation which has been placed by the people through the Constitution upon the power of the legislature to act, before it may be declared unconstitutional.

Therefore, the county jail overcrowding act must be found to .be constitutional unless a specific limitation, contained in the constitution itself, restricts legislative power in this area. I find such a limitation is clearly mandated by the specific grant of power over commutations given by the people to the executive branch.

jail according to the terms of his or her sentence, including computations for good time.

(f) The name of the judge who imposed the sentence.

(2) After the chief circuit judge for the county in which the jail is located reviews the information presented by the sheriff pursuant to subsection (1), the chief circuit judge shall, for purposes of county jail population reduction, classify the prisoners into 2 groups: those prisoners who, if released, would present a high risk to the public safety, and those who, if released, would not present a high risk to the public safety. The chief circuit judge shall also determine a minimum and a maximum percentage by which the sentences can be reduced. The sheriff shall reduce the sentences of all prisoners who, if released, would not present a high risk to the public safety by an equal percentage which is within the minimum and maximum percentages determined by the chief circuit judge.

(3) The sentences of prisoners sentenced to and housed in the county jail after the fourteenth day of the county jail overcrowding state of emergency may continue to be reduced in the same manner as prescribed in subsections (1) and (2), but shall not be reduced after the county jail overcrowding state of emergency is ended or after the sheriff orders a sentence reduction pursuant to section 7, whichever occurs first.

Const 1963, art 5, § 14 provides:

> The governor shall have power to grant re-
> prieves, commutations and pardons after convic-
> tions for all offenses, except cases of impeachment,
> upon such conditions and limitations as he may
> direct, subject to procedures and regulations pre-
> scribed by law. He shall inform the legislature
> annually of each reprieve, commutation and par-
> don granted, stating reasons therefor.

This power is granted solely to the Governor.
There is no provision granting like power to either
the legislative or the judicial branch of govern-
ment. As we stated in *Rich v Chamberlain,* 104
Mich 436, 446; 62 NW 584 (1895), such "power is
vested exclusively in the Governor of the State,
and any law which restricted this power would be
unconstitutional and void." In the same case we
also reiterated the reasoning behind the exclusiv-
ity of the Governor's commutation power:

> It is therefore of the highest importance to the
> public that this power should be carefully exer-
> cised, and that the fullest responsibility should
> rest upon the person to whom it is confided. The
> office of Governor seems to be generally considered
> the proper one with which to lodge such responsi-
> bility, and the public have the right to insist upon
> his performance of the duty. Not only is it beyond
> the power of the Legislature to impose the duty
> upon others, but it should not in any way lessen
> his responsibility to the public, when he sets aside
> the judgment of court and jury by opening the
> doors of a prison to a convicted felon. If the act in
> question does this, it should not be sustained. [*Id.,*
> p 442.]

We also recognized the exclusivity of this power
in *People v Fox,* 312 Mich 577; 20 NW2d 732

(1945), and *People v Whalen,* 412 Mich 166, 169; 312 NW2d 638 (1981), where we noted that

> a trial court is without authority to set aside a valid sentence and impose a new one, because to do so "would infringe upon the exclusive power of the governor under the Constitution to commute sentence."

Const 1963, art 4, § 45 states:

> The legislature may provide for indeterminate sentences as punishment for crime and for the detention and release of persons imprisoned or detained under such sentences.

It was only on the basis of this specific grant of power that we found that the prison overcrowding act, MCL 800.71; MSA 28.1437(1), was constitutionally permissible, even though application of the act could result in a reduction of the length of indeterminate sentences. *Oakland Co Prosecutor v Dep't of Corrections,* 411 Mich 183; 305 NW2d 515 (1981).

Jail sentences, as my colleagues agree, are not indeterminate—they are for a fixed and determinate amount of time. Therefore, the grant of power over indeterminate sentences may not properly be applied to find that the Legislature has not unconstitutionally infringed on the Governor's commutation power in adopting the county jail overcrowding act.

In *People v Freleigh,* 334 Mich 306; 54 NW2d 599 (1952), this Court determined that determinate sentences which were imposed as on the basis of an earlier mandatory sentencing statute could not constitutionally be reduced by the Legislature's adoption of a later indeterminate sentencing provi-

sion. As we clarified in *Oakland Co Prosecutor,*
*supra,* p 196:

> The statute considered in *Freleigh,* unlike 1980
> PA 519, did not provide for . . . release of persons
> imprisoned or detained under *indeterminate* sen-
> tences (emphasis supplied) since, as the Court
> there observed, the statute had "retroactive effect
> upon sentences which were *mandatory.*"

Thus, we have determined that commutative
power over determinate sentences is not within
the specific powers granted to the Legislature. It
follows that the county jail overcrowding act is
unconstitutional if it operates to commute determi-
nate sentences. I find that it does.

Commutation has been defined as "the change of
a punishment to one which is less severe." Black's
Law Dictionary (5th ed), p 254. Although my col-
leagues maintain that a commutation must be an
act of individualized clemency, citing for the prop-
osition a concurrence in a California case, *Way v*
*San Diego Co Superior Court,* 74 Cal App 3d 165,
177; 141 Cal Rptr 383 (1977), the majority in that
case clearly held:

> Amicus curiae suggests that commutation and
> pardon are not the equivalent of amnesty and that
> accordingly even if the Legislature does not have
> the power to grant individual commutations, the
> legislation must be upheld as an amnesty or gen-
> eral pardon of current ISL prisoners. Such a dis-
> tinction has deep historical roots. However, it has
> been firmly rejected by the federal courts, and we
> are unaware of any state court decision adopting
> it. Amnesty is nothing more than collective par-
> don, and the distinction between the two is with-
> out legal significance; only the Governor can grant
> general amnesty, as only he can pardon or com-
> mute. [Citations omitted.]

The United States Supreme Court also noted the trivial distinction between individualized and general clemency in *Brown v Walker,* 161 US 591, 601; 16 S Ct 644; 40 L Ed 819 (1896).

> The distinction between amnesty and pardon is of no practical importance. It is said in *Knote v United States,* 95 US 149, 152 [24 L Ed 442 (1877)], "the Constitution does not use the word 'amnesty,' and, except that the term is generally applied where pardon is extended to whole classes or communities, instead of individuals, the distinction between them is one rather of philological interest than of legal importance."

In addition, it cannot be said that the process mandated by the county jail overcrowding act does not involve individualized clemency. Pursuant to § 6, the chief circuit judge for the county is required to review the name of each prisoner, the offense for which the prisoner was convicted, the length of the individual's sentence, the date on which the prisoner began serving the sentence, the release date, and the name of the sentencing judge. The judge then makes an individual determination for each prisoner as to whether or not the sentence should be reduced, based on an assessment of the risk involved.

Clearly, the sentences of the prisoners who benefit from an application of the county jail overcrowding act are reduced from the time specified by the sentencing judge. This, in my estimation, is a commutation in every sense of the word. As we have previously determined that the Governor's power of commutation is exclusive and because there is no constitutional grant of power to the Legislature over determinate sentences, I would affirm the decision of the Court of Appeals and

find that the county jail overcrowding act is unconstitutional.

BRICKLEY and RILEY, JJ., concurred with BOYLE, J.

LEVIN, J. The county jail overcrowding act, 1982 PA 325,[1] authorizes a county sheriff to declare a jail overcrowding state of emergency, and sets forth a multistep procedure for reducing the prisoner population of county jails when a state of emergency has been declared.

The question presented is whether Act 325 unconstitutionally contravenes the Governor's commutation power under Const 1963, art 5, § 14. We conclude that it does not.[2]

I

Act 325 provides that a sheriff shall declare a jail overcrowding state of emergency if the general prisoner population of a county jail exceeds one hundred percent of the jail's rated design capacity for seven consecutive days, unless within three business days a majority of the chief circuit judge, chief district judge, and each municipal judge in

[1] MCL 801.51 et seq.; MSA 28.1748(1) et seq.

[2] The Sheriff of Kent County declared an "overcrowded state of emergency" for the Kent County jail, pursuant to Act 325, on May 12, 1983.

The prosecuting attorney for Kent County commenced this action, seeking a declarative judgment that Act 325 was unconstitutional and an injunction barring the release of prisoners before the expiration of their sentences. The prosecuting attorney also sought a preliminary injunction to prevent prisoner release while this action was pending. The Kent County Office of the Defender was permitted to intervene as a defendant.

The circuit court denied the motion for a preliminary injunction, subsequently ruled that the act was constitutional, and denied the prosecutor's request for declaratory relief. The Court of Appeals reversed, and declared the act unconstitutional on the ground that it usurps the Governor's power of commutation. 133 Mich App 611; 350 NW2d 298 (1984).

the county and certain county officials, find that the sheriff acted in error.[3]

If the judges and the sheriff are unable by other means[4] to reduce the prison population to ninety percent of rated design capacity within fourteen days after the declaration of the state of emergency, the sheriff shall present to the chief circuit judge certain information concerning each prisoner residing in the county jail at that time. The chief circuit judge is required to classify the prisoners into two groups: high-risk and non-high-risk individuals. The chief circuit judge also must determine a minimum and maximum percentage by which the sentences can be reduced. The sheriff must then reduce the sentences of all prisoners who would not present a high risk to the public safety, if released, by an equal percentage which is within the minimum and maximum percentages determined by the chief circuit judge.[5]

If these actions do not reduce the jail's population to ninety percent of rated design capacity within twenty-eight days after the declaration of the state of emergency, the original sentences, not including good time, of all prisoners sentenced to and housed in the jail on that date shall be equally reduced by the sheriff by the least possible percentage necessary, not to exceed thirty percent, to reduce the jail's population to ninety percent of the rated design capacity.[6]

II

The pertinent sentence reduction provisions[7] are modeled on the sections in the Prison Overcrowd-

[3] MCL 801.52, 801.53; MSA 28.1748(2), 28.1748(3).

[4] MCL 801.55; MSA 28.1748(5).

[5] MCL 801.56; MSA 28.1748(6).

[6] MCL 801.57; MSA 28.1748(7).

[7] MCL 801.56, 801.57; MSA 28.1748(6), 28.1748(7).

ing Emergency Powers Act[8] that authorize reduction in the minimum sentence of prisoners in state prisons by the Director of the Department of Corrections upon a declaration of emergency not found to be erroneous by the Governor.[9] These provisions were challenged in *Oakland Co Prosecutor v Dep't of Corrections,* 411 Mich 183, 195; 305 NW2d 515 (1981), as violative of the constitutional authority of the Governor to commute sentences. The constitution provides:

> The governor shall have power to grant reprieves, commutations and pardons after convictions for all offenses, except cases of impeachment, upon such conditions and limitations as he may

[8] MCL 800.71 *et seq.;* MSA 28.1437(1) *et seq.*

[9] At the time the case was decided the analogous provisions of the Prison Overcrowding Emergency Powers Act stated:

The commission shall request the Governor to declare a state of emergency in the state's prisons whenever the population of the prison system exceeds the rated design capacity for 30 consecutive days. In making the request, the commission shall certify the rated design capacity and current population of the prison system and that all administrative actions consistent with applicable state laws and the rules promulgated under those laws have been exhausted in an attempt to reduce the prison population to the rated design capacity. [MCL 800.73; MSA 28.1437(3).]

Unless the governor finds within 15 calendar days of the commission's request under section 3 that the commission acted in error, the governor shall declare a prison overcrowding state of emergency within that 15 days and the minimum sentences of all prisoners who have established minimum prison terms shall be reduced by 90 days by the director of the department of corrections. [MCL 800.74; MSA 28.1437(4).]

If the actions under section 4 do not reduce the population of the prison system to 95% of the rated design capacity within 90 days of the date of the declaration of the prison overcrowding state of emergency, the minimum sentences of all prisoners incarcerated in state prisons on that date who have established minimum prison terms shall be reduced by 90 days by the director of the department of corrections. [MCL 800.75; MSA 28.1437(5).]

The act was amended in 1983 without substantive change.

direct, subject to procedures and regulations prescribed by law. He shall inform the legislature annually of each reprieve, commutation and pardon granted, stating reasons therefor. [Const 1963, art 5, § 14.]

This Court ruled that the prison overcrowding act was constitutional. The opinion of the Court relied in part on Const 1963, art 4, § 45, which empowers the Legislature to "provide for indeterminate sentences as punishment for crime and for the detention and release of persons imprisoned or detained under such sentence." This Court said that "[a]lthough the retroactive reduction of minimum sentences because of prison overcrowding has consequences similar to commutation, it derives from a wholly separate constitutional grant of power. The legislation was within the constitutional grant of authority to the Legislature in art 4, § 45 to 'provide for . . . release of persons imprisoned or detained under such sentences.' " 411 Mich 197. The act was found to be within this authority granted the Legislature, and thus constitutional, *regardless of whether the release of prisoners under the statute is properly characterized as a commutation." Id.* at 195. (Emphasis supplied.)

It is contended that the jail overcrowding act cannot be sustained on the basis of art 4, § 45 because sentences to a county jail—which cannot exceed one year—are generally fixed or determinate rather than indeterminate sentences.[10]

---

[10] The Legislature, in the exercise of its power to provide for the length and place of imprisonment, has distinguished between sentences to the state prison system and sentences to county jails.

MCL 769.28; MSA 28.1097(1) provides that crimes for which the punishment is one year or less shall be punished by imprisonment in the county jail and not in the state prison system. Sentences of more than one year are to be served in the state prison system.

### III

The argument that one year or less sentences to the county jail are fixed or determinate and thus not within the scope of art 4, § 45 ignores that all sentences to a county jail imposed after February 8, 1983—the effective date of Act 325—are subject to the provisions of Act 325. While such sentences are generally fixed or determinate, one year or less sentences imposed after February 8, 1983, are indeterminate to the extent that the Legislature has empowered the sheriff and the judges to reduce the sentences.

The power conferred by Act 325 on the sheriff or judges to reduce a sentence, and thus the time of confinement, is essentially the same kind of power conferred on the parole board. A sentence to six months or one year in the county jail is fixed or determinate to the extent that a definite time is stated, i.e., six months or one year, but is indeterminate insofar as the act empowers the sheriff or judges to reduce the sentence. Although ordinarily an indeterminate sentence has a minimum term stated by the judge at the time of sentencing, and a maximum term set by the judge or the Legislature, an indeterminate sentence may be for a definite or fixed term at the time of sentencing with a power in a parole board or sheriff or judges to set, at some future time, a lower minimum time of confinement.

---

The indeterminate sentencing act provides for most offenses punishable by imprisonment in state prison an indeterminate sentencing structure—the maximum sentence is set by statute and a minimum sentence is set by the sentencing judge. MCL 769.8; MSA 28.1080. The Legislature has not provided a similar sentencing scheme for persons sentenced to county jails. The Court of Appeals has held that the indeterminate sentencing act is inapplicable to a county jail sentence for either a felony or misdemeanor. *People v Lyles,* 76 Mich App 688; 257 NW2d 220 (1977); *People v Leonard,* 51 Mich App 368; 214 NW2d 888 (1974). See also OAG, 1983-1984, No 6131, p 44 (February 16, 1983).

In *People v Freleigh,* 334 Mich 306; 54 NW2d 599 (1952), this Court held unconstitutional legislation that empowered a judge to establish retroactively a lower sentence than had been initially imposed. *Freleigh* said that the Legislature cannot empower a judge to change a sentence imposed before the legislation was enacted.[11] There is, however, nothing in *Freleigh,* or any other case decided by this Court since the indeterminate sentencing provision was added to the 1850 Constitution in 1901,[12] that bars the Legislature from empowering a judge or other governmental authority to change a sentence or establish a lower minimum sentence at some time after the sentence is first imposed if legislation empowering the judge or other governmental authority to do so is enacted and becomes effective before the sentence is initially imposed. Where a sentence is imposed after the enactment of legislation conferring the power to change a sentence—here, after February

---

[11] It should not be assumed that the Legislature cannot convert a determinate sentence, once imposed, into an indeterminate sentence. It is arguable that if the Legislature were to provide for a general reduction of the term of what otherwise would be determinate sentences, or for early release of persons serving determinate sentences, that those sentences would thereupon become indeterminate sentences. All that the Legislature arguably would have done is exercise its power to "provide for indeterminate sentences" (art 4, § 45) by converting what would otherwise be determinate sentences into indeterminate sentences. There may be no inconsistency between the Governor's power and the legislative power: The Governor has the power to commute; the Legislature has the power to provide an indeterminate sentence. *Freleigh* did not consider the Legislature's power to set an indeterminate sentence.

The instant case does not require that we decide whether the Legislature has the power to provide for changing a determinate sentence into an indeterminate sentence or for lowering the minimum term of an indeterminate sentence after the sentence has been imposed. We add this footnote lest this opinion be read as saying that the Legislature could not do so. We intimate no opinion on this question.

[12] Const 1850, art 4, § 47, as amended by joint resolution 1901, No. 197. Const 1908, art 5, § 28.

8, 1983—the situation posed in *Freleigh* is not confronted.

## IV

The sheriff contends that to shorten a sentence is, in effect, to commute that sentence, and that the Governor has exclusive authority to commute a sentence. Not every shortening of a sentence is a commutation. Reprieve, pardon, and commutation are acts of individualized clemency.[13] The statutory requirements for commutation include (i) application, (ii) notice to the Governor, prosecuting attorney of the county having original jurisdiction of the case, and the sentencing judge, (iii) an opportunity for them to object, (iv) public hearing, and (v) full investigation by the parole board.[14] The reduction of a number of sentences pursuant to Act 325 has consequential similarities to commutation, but results from exercise of a wholly different kind of governmental power.[15]

## A

The constitution provides: "The legislative power of the State of Michigan is vested in a senate and a house of representatives."[16] The Legislature thus has the power to designate the grade of, and

[13] In *United States v Wilson,* 32 US (7 Pet) 150; 8 L Ed 640 (1833), the United States Supreme Court defined a pardon as an

> *act of grace,* proceeding from the power entrusted with the execution of the laws, which exempts *the individual,* on whom it is bestowed, from the punishment the law inflicts for a crime he has committed. [*Id.* at 160. Emphasis added.]

[14] MCL 791.243, 791.244; MSA 28.2313, 28.2314.

[15] *Way v San Diego Co Superior Court,* 74 Cal App 3d 165, 181; 141 Cal Rptr 303 (1977) (Friedman, J., concurring).

[16] Const 1963, art 4, § 1.

prescribe penalties for, criminal offenses,[17] the power to determine the length of imprisonment for a felony,[18] and to alter established rules of criminal responsibility.[19]

Act 325 provides for the early release from service of a sentence on the basis of generalized criteria not designed to reduce the length of time served by a particular offender or class of offender. The potential for a reduction of sentence pursuant to a declaration of emergency does not involve the factors that a judge would consider in sentencing.[20] A reduction depends primarily on the occurrence of a greater than one hundred percent rated design capacity in the jail for a set period of time. There is individual review only insofar as the

[17] See *People v Auer,* 393 Mich 667, 678-679; 227 NW2d 528 (1975), where this Court sustained resentencing of a defendant under the then new § 41 of the Controlled Substances Act, which provided that a sentence in excess of that prescribed in the act shall not be imposed on a person who, before the effective date of the act, committed an offense similar to one set out in the act, but who had not yet been sentenced. See also *People v Causley,* 299 Mich 340, 348; 300 NW 111 (1941).

[18] See *In re Callahan,* 348 Mich 77; 81 NW2d 669 (1957), where this Court held to be constitutional a statutory provision that a sentence for a felony committed while on parole shall commence at the expiration of the prior sentence against a challenge that the statute violated the separation of powers. See also *People v Harwood,* 286 Mich 96; 281 NW 551 (1938).

If Act 325 were held to be unconstitutional, the Department of Corrections might not be able to operate halfway houses or otherwise release from incarceration a prisoner before he has served the entire sentence.

[19] MCL 800.71 *et seq.;* MSA 28.1437(1) *et seq.*

See *People v Morris,* 80 Mich 634, 641; 45 NW 591 (1890), where this Court recognized that the Legislature has the constitutional power to fix the minimum as well as the maximum term of imprisonment and the power to define a "crime" and prescribe punishment.

[20] See also *People v Pulley,* 411 Mich 523; 309 NW2d 170 (1981), in which the character of the sentencing proceeding was likened to the process of determining guilt or innocence at trial, and *People v McFarlin,* 389 Mich 557, 574; 208 NW2d 504 (1973), which emphasized that the sentence should be tailored to the particular circumstances of the case and offender. Contrast these principles with the massive, generally nonindividualized reduction of sentences pursuant to Act 325.

sheriff presents to the chief circuit judge for the county in which the jail is located factual information about the prisoner including his name, offense, length of sentence, and scheduled release date (taking into account reduction for good time).[21] The chief circuit judge, having reviewed the information, classifies the prisoners into two groups—those who, if released, would present a high risk to the public safety, and those who would not.

The criterion for this determination—essentially the offense committed[22]—differs from the multiple factors that a judge might consider in imposing a sentence. The Sentencing Guidelines Manual provides sentencing grids and offense variables that include the use of a weapon, physical attack or injury, the offender's role, and whether there were multiple victims and prior felony or misdemeanor convictions. The sentence grid also takes into consideration mitigating variables such as provocation or mistake. The absence of such criteria for determining who would be released early, pursuant to Act 325, means that it is not contemplated that there will be individualizing in the release decision as is done in sentencing.

B

A number of statutes that provide for a reduction of determinate sentences on the basis of non-sentencing criteria have not been thought to violate the Governor's commutation power.[23] The good

---

[21] See n 5.

[22] Other than the name, the date on which the sentence began, and the judge who imposed the sentence, the only information given to the chief circuit judge is the offense committed and the scheduled release date. See n 5.

[23] This Court noted in *Oakland Co Prosecutor*, 411 Mich 194, n 11, that the prison overcrowding act is similar in effect to, and identical

time acts provide for a mandatory reduction in the county jail sentence of five days for each month of the sentence for every prisoner whose record shows no violation of the rules and regulations.[24] Pursuant to the day parole statute, a county jail prisoner may receive, if approved by the court, a reduction of one-fourth of his term if his conduct, diligence, and general attitude merit such reduction.[25] A fixed deduction of three days per month from the sentence of county prisoners is authorized for obedience to the rules of a work farm, factory, or shop.[26]

C

Const 1963, art 5, § 14 empowering the Governor to grant commutations, reprieves, and pardons, does not state that such power is exclusive.[27] The

---

in terms of the power exercised by, the enactment of the "good time" acts. It is argued in the instant case that the Court would have relied on these acts, rather than relegating them to a footnote, if they indeed supported the Legislature's power to pass such emergency legislation. No such inference can properly be drawn.

The sheriff attempts to distinguish the good time acts and other acts providing for disciplinary credits on the basis that at the time of sentencing the judge knows of the possibility for a reduction in the sentence according to the scheme set forth in those acts and can take this into account to augment the sentence accordingly. The Court of Appeals, however, has expressed concern about the imposition of an augmented minimum sentence on the basis of the expectation that the defendant would serve a significantly reduced term as a result of legislatively authorized disciplinary credits (MCL 800.33; MSA 28.1403) or the application of the provisions of the Prison Overcrowding Emergency Powers Act (MCL 800.71 *et seq.;* MSA 28.1437(1) *et seq.*). See *People v Fleming,* 142 Mich App 119, 125-126; 369 NW2d 499 (1985).

[24] MCL 51.282; MSA 5.883(2).

The good time acts provide for a graduated monthly reduction in a state prison sentence if a convict has not violated rules of the prison. These good time credits are mandatory—additional credits are discretionary. MCL 800.33; MSA 28.1403.

[25] MCL 801.257; MSA 28.1747(7).

[26] MCL 801.214; MSA 28.1803.

[27] Although the United States Constitution provides that the Presi-

provision stating that the powers of government
are divided among three branches of government
does not bar overlapping in the exercise of power
by the several branches.[28] The principle of separa-
tion of powers precludes one branch of government
from exercising *all* the powers of a coördinate
branch.[29]

The constitution empowers the Legislature to
enact a law unless it has been prohibited. In

dent is empowered to proclaim general amnesty, the United States
Supreme Court has found that Congress retains a similar power,
saying, "Although the Constitution vests in the President 'power to
grant reprieves and pardons for offenses against the United States,
except in cases of impeachment,' this power has never been held to
take from Congress the power to pass acts of general amnesty."
*Brown v Walker,* 161 US 591, 601; 16 S Ct 644; 40 L Ed 819 (1896).

Legislative amnesties passed subsequent to the Civil War both by
Congress and by state legislatures were not declared unconstitutional
by any court. There is some authority for the view that the Legisla-
ture is empowered to grant individual pardons. See Weihofen, *Legisla-
tive Pardons,* 27 Cal L R 371, 375, n 10, 376, n 15 (1939).

[28] Const 1963, art 3, § 2.

Justice Holmes wrote, "The great ordinances of the Constitution do
not establish and divide fields of black and white. Even the more
specific of them are found to terminate in a penumbra shading
gradually from one extreme to the other." *Springer v Government of
Philippine Islands,* 277 US 189, 209-212; 48 S Ct 480; 72 L Ed 2d 845
(1928) (Holmes and Brandeis, JJ., dissenting).

[29] This Court has quoted approvingly Story, Constitutional Law (4th
ed), p 380:

When we speak of a separation of the three great depart-
ments of government, and maintain that that separation is
indispensable to public liberty, we are to understand this
maxim in a limited sense. It is not meant to affirm that they
must be kept wholly and entirely separate and distinct, and
have no common link or dependence, the one upon the other, in
the slightest degree. The true meaning is that the whole power
of one of these departments should not be exercised by the
same hands which possess the whole power of either of the
other departments; and that such exercise of the whole would
subvert the principles of a free Constitution. [*State, County &
Municipal Workers v Dearborn,* 311 Mich 674, 677; 19 NW2d
140 (1945).]

See also *The Federalist,* No. 47 (J. Madison); *Soap & Detergent
Ass'n v Natural Resources Comm,* 415 Mich 728, 751-752; 330 NW2d
346 (1982); *People v Piasecki,* 333 Mich 122, 146; 52 NW2d 626 (1952).

declaring a statute unconstitutional, a court must be able to "lay [its] finger on the part of the Constitution violated, and . . . the infraction should be clear, and free from a reasonable doubt." *Bowerman v Sheehan,* 242 Mich 95; 219 NW 69 (1928).

The decisions of this Court do not support the claim that the Governor's power to commute is so far "exclusive" that the other branches of government may not act with respect to a sentence. Nor do the decisions of this Court support the contention that the commutation power is infringed by legislation designed to relieve overcrowded jails.[30]

---

[30] See also *People v Cummings,* 88 Mich 249; 50 NW 310 (1891), where this Court declared unconstitutional a statute that provided for indeterminate sentencing. The infirmity of the statute lay in its delegation of the authority to terminate a general sentence to the board of control of prisons—composed of four unelected officials—and the absence of judicial review of their exercise of discretion. The Court said:

> It is in the power of the Legislature to fix all punishment for crime, and to provide for a minimum and maximum punishment, and to give the courts in which the prisoners are convicted a discretion to fix a term between these limits, but it cannot be contended for a moment that this discretion can be given to any other person or persons. . . . Nor can the Legislature authorize a circuit judge to delegate his power and discretion in such a case to any other person or persons than himself. [*Id.* at 252-253.]

The bulk of the opinion dealt with language providing that a paroled convict could, at any time, be brought back to prison on order of the board without a hearing or judicial review. The provision was invalid in two respects: (1) the potential for arbitrary exercise of the authority by the board, e.g., by imposition of conditions to parole, and (2) infringement of the Governor's "absolute" (*id.* at 251-252) power to pardon which "belongs to [him] alone" (*id.* at 255) if the parole became a full release.

After *Cummings,* the Legislature submitted to the people an amendment to the 1850 Constitution which was adopted. The amendment stated that the Legislature may provide for indeterminate sentences and for the detention and release of persons imprisoned on such sentences. The indeterminate sentencing law was held to be constitutional in *People v Cook,* 147 Mich 127, 132; 110 NW 514 (1907). The amendatory language was retained in Const 1908, art 5, § 28, and Const 1963, art 4, § 45.

In the cases relied on to support the decision of the Court of Appeals, the challenged judicial action was with respect to a particular person rather than an enactment that applied generally to a group of persons.[31] *People v Brown,* 54 Mich 15; 19 NW 571 (1884), illustrates the degree of individualization in these cases. The question was whether a judge was empowered to in effect pardon a particular defendant in response to a petition signed by thirty-five prominent citizens of the city seeking an "entire and absolute remission of all penalty and excusing of all guilt" by indefinitely suspending the sentence. In *People v Fox,* 312 Mich 577; 20 NW2d 732 (1945), the judge modified the original sentence of life imprisonment to fifteen to twenty years, stating that the sentence seemed too severe once he became aware of the good character of the defendant and all the facts and circumstances.[32] In *People v Whalen,* 412 Mich 166; 312

Early release under Act 325 does not depend on factors subject to abuse or arbitrary action. The "scale of reduction" is definite—equal reduction of all prisoner sentences not to exceed thirty percent—and is called into effect by a fixed rule, one hundred percent plus of the designed occupancy rate for over twenty-eight days.

[31] Unless the high-risk classification were to be done pretextually, Act 325 affects a large group of persons. If a chief circuit judge were to classify all but a selected few prisoners as high risk or low risk, then Act 325 *might* become unconstitutional as applied. The situation might then be similar to that in *Freleigh,* because, in effect, the judge would have made a particularized decision as to the sentence of a few individuals. This is not the way the Legislature intended the jail overcrowding act to operate.

[32] The cases relied on in *Fox* speak in terms of a judge lacking the power to amend a sentence once it has gone into effect. The underlying principle apparently is that the judiciary's authority to sentence a particular defendant terminates once a sentence has been imposed and has begun to be served. These cases do not consider, although *Freleigh* does, whether there are limitations on the legislative power.

*Fox* quotes from *Brown v Rice,* 57 Me 55, 56; 2 Am Rep 11 (1869), where the Supreme Judicial Court of Maine said: "When the court has [sentenced the defendant] it would seem to have done all that it had legal power to do . . . ." Similarly, in *People v Meservey,* 76 Mich 223, 226; 42 NW 1133 (1889), this Court said, with respect to an attempt to resentence the defendants for a longer term one day after

NW2d 638 (1981), the judge vacated a valid sentence because of unkept promises made to the defendant by FBI agents. *Freleigh* is similarly distinguishable; the habitual offender act required the judge to render an individualized decision and authorized him to change the sentence of a particular habitual offender.

V

The general provisions of the jail overcrowding act are not applied through the judiciary on an individualized basis. No new sentence is pronounced. Any general mercy arising from the exercise of the power conferred by the act is simply incidental to the primary goal of relieving county jail overcrowding, a goal clearly within the plenary power of the Legislature.

A

The constitution confers on the Legislature the duty to regulate the public health and general welfare of the people of the state. The constitution contemplates that the Legislature will "pass suitable laws for the protection and promotion of the public health."[33] The Legislature may also enact "emergency statutes" designed to promote the "health, morality, comfort and peace of the people of the State" as an incident of the legislative power, sometimes referred to as the police power.[34]

Act 325 is an enactment in furtherance of the

the original sentence was imposed, "The circuit judge had no power at that time to vacate the sentences, because the authority over the prisoners had passed out of his hand by his own order."

[33] Const 1963, art 4, § 51.

[34] See *Edgar A Levy Leasing Co, Inc v Siegel,* 258 US 242; 42 S Ct 289; 66 L Ed 595 (1922); *People v Sell,* 310 Mich 305; 17 NW2d 193 (1945).

public health of the state's jail population. It was a legislative response to a serious, immediate problem following a legislative investigation and hearings concerning the recurrent problem of overcrowding in numerous county jails.[35]

Jail overcrowding endangers the physical well-being of persons incarcerated by increasing the risk of infectious diseases and increased susceptibility to disease due to stress caused by crowding, and heightens the potential for prison riots and disruptions.[36]

---

[35] This Court relied on the legislative history and demonstrated concerns for the consequences of overcrowding in *Oakland Co Prosecutor v Dep't of Corrections*, 411 Mich 186-188, with a reference to the Report of the Joint Legislative/Executive Task Force on Prison Overcrowding (June 24, 1980), p i.

A letter dated September 1, 1983, from the Michigan Sheriffs' Association states information obtained from the Department of Corrections, Office of Facility Services, indicating that 22.8 percent of the county jails were at one hundred percent of rated design capacity, 7.23 percent were at ninety to ninety-nine percent capacity, and 15.669 percent were between eighty and eighty-nine percent capacity during the period January to June, 1983.

[36] If this Court were to hold Act 325 unconstitutional or to say in effect that the Legislature cannot address or remedy the conditions that inspired the legislation, this might invite judicial intervention and result in loss of control of the jail system. See, generally, Judge, *Relief for prison overcrowding: Evaluating Michigan's accelerated parole statute*, 15 U Mich J L Ref 547 (1982).

The final legislative analysis (on House Bill 5328) prepared by the House Legislative Analysis Section indicates that the Legislature was concerned about the potential for judicial intervention respecting county jails in enacting Act 325:

> [T]hese conditions can also be expensive to local governments who are exposed to lawsuits—in the last three years 160 lawsuits have been filed in Michigan in relation to county jail conditions. Three of the state's largest jails—Wayne, Oakland, and Genesee—are already operating under state court order to limit jail population. Although no Michigan county has yet been required to operate under the supervision of a master appointed by a federal court, this has happened in other states and is a significant threat to local control of jails. [House Legislative Analysis, HB 5328, May 25, 1982.]

Overcrowding has obliged officials to reduce security classifications and to place inmates in less secure quarters. At least fifty-six percent

B

In *Oakland Co Prosecutor,* this Court recognized that a reduction in sentence pursuant to the prison overcrowding act was "part of a broad-based effort at correctional reform, it was intended to deal with a systemwide problem."[37] A court of appeals for the State of California took a similar approach in rejecting challenges to its uniform determinate sentencing act that replaced the indeterminate sentencing act.[38] To achieve uniformity, the act provided for retroactive application to prisoners incarcerated under the indeterminate sentencing act. The California court initially said that the legislature was not empowered to commute prison sentences and that the act had the effect of commutation in certain cases. The court concluded, however, that there was not such an invasion of the executive power as to make the retroactive feature of the act unconstitutional, primarily because the shortening of prison terms was incidental to the main legislative purpose: "We note that the motivation behind [the act] is not consistent with commutation. The Legislature's objective, admittedly one within its power, is to restructure punishments for criminal conduct and to make them uniform to the extent reasonably possible. . . . It undertook no act of mercy, grace or forgiveness toward past offenders, such as characterizes true commutations."[39]

of the 457 prisoners who escaped in 1985 from unfenced, minimum security prisons should have been in more secure facilities, according to the Michigan Department of Corrections. *Jammed Prisons Tied to Escapes,* Detroit News, December 25, 1985.

[37] 411 Mich 197.

[38] *Way v San Diego Co Superior Court,* n 15 *supra.*

[39] *Id.* at 177.

The reasoning of *Way* was approved in *Younger v Sacramento Co Superior Court,* 21 Cal 3d 102, 117-118; 145 Cal Rptr 674; 577 P2d

1014 (1978), which dealt with legislation authorizing the destruction of records of a conviction for possession of marijuana. Following the reasoning in *Way,* the California Supreme Court held that this legislation was not violative of the separation of powers, saying, "Any infringement on the power of executive clemency is thus purely incidental to the main purpose of the statute [reducing the adverse social and personal effects of a conviction that might linger long after the prescribed punishment has been completed] which is well within the province of the Legislature . . . ."

A similar issue has been addressed in other jurisdictions. In *State v Morris,* 55 Ohio St 2d 101; 378 NE2d 708 (1978), the Supreme Court of Ohio held that a new controlled substances act that required the trial court to review previously imposed sentences and allowed for reduction or alteration of such sentences did not unconstitutionally infringe the governor's pardoning power. The legislation was seen as in effect granting a general pardon, but was found to be within the plenary power of the legislature to prescribe penalties for crimes.

Contra *People v Herrera,* 183 Colo 155; 516 P2d 626 (1973), where the Supreme Court of Colorado struck down a statute that authorized postconviction review of sentences and retroactive application of changed legal standards on the ground it infringed on the governor's exclusive power to grant commutations. In *State ex rel Pettit v Thurmond,* 516 SW2d 119 (Tex, 1974), the Texas Supreme Court held that a statute that permitted persons convicted of possession of marijuana to be sentenced as misdemeanants if the conviction was pending on appeal on the effective date of the statute making the crime a misdemeanor (instead of a felony) was unconstitutional as it amounted to a commutation of sentence which is exclusively a prerogative of the governor. The court noted that "[a]s this statute concerns a matter peculiarly within the jurisdiction of the Court of Criminal Appeals, we feel constrained to follow its decision" and invalidated the statute. *Id.* at 121.

Also, compare *Bossie v Maine,* 488 A2d 477, 479-480 (Me, 1985), where the Supreme Judicial Court of Maine held unconstitutional a statute increasing "good time" reductions available to prisoners committed to custody before its effective date because it acted to commute "the lengths of existing sentences" and *Gilbert v Maine,* 505 A2d 1326 (Me, 1986), in which the Court found unconstitutional the application of the discharge provision which was added many years subsequent to Gilbert's sentence to life imprisonment without parole. The provision vested the parole board with discretionary authority to provide a person sentenced to life imprisonment with *full discharge* after ten years of parole. Other amendments providing that such a person was *eligible for parole* after completion of a fifteen-year minimum term were held to be constitutional.

In New Jersey, remedial measures to relieve a prison overcrowding state of emergency taken by the governor were challenged as violative of the separation of powers. Pursuant to his emergency powers under the civil defense and disaster control act, the governor had issued an executive order which authorized the commissioner of corrections to direct that state prisoners be housed in county correctional facilities and to redistribute prisoners among the counties. The

VI

The validity of retroactive application of new legislation to sentences previously imposed, the issue that confronted the California court and which confronted this Court in *Oakland Co Prosecutor,* is not, as a practical matter, presented in the instant case. In those cases, legislation provided for reduction of the terms of confinement of persons who had been sentenced before the enactment of the legislation. Because imprisonment in the county jail is for a term of one year or less,[40] whatever may have been the situation at the time the instant action was commenced, by now there will be few, if any, persons serving sentences imposed before February 8, 1983, the effective date of Act 325.[41]

VII

We repeat from *Oakland Co Prosecutor,* that "[t]he Legislature too has a role in establishing the length of sentence,"[42] and would hold that Act 325 is constitutional.

We would reverse and remand to the circuit court for additional proceedings consistent with this opinion.

WILLIAMS, C.J., and CAVANAGH, J., concurred with LEVIN, J.

ARCHER, J., took no part in the decision of this case.

---

New Jersey Supreme Court held the action was constitutional against a challenge that it was in derogation of the authority of the Legislature. *Worthington v Fauver,* 88 NJ 183; 440 A2d 1128 (1982).

[40] See n 10.

[41] MCL 801.64; MSA 28.1748(14).

[42] *Oakland Co Prosecutor, supra,* at 193.