MAEKMAN, J.
We granted leave to appeal to consider whether Const 1963, art 8, § 9, which states that public libraries “shall be available to all residents of the state,” requires each individual public library facility in Michigan to offer nonresident book-borrowing privileges.[1] *557 The lower courts answered this question in the negative, and we agree, although for different reasons. Therefore, we affirm.
I. FACTS AND PROCEDURAL HISTORY
Plaintiff is a resident of the city of Bloomfield Hills. The city does not have its own public library, but from 1964 to November 12, 2003, had entered into a “library service agreement” with defendant Bloomfield Township Public Library that, for a fee, permitted city residents full access to the library and to other area libraries that were also signatories to the agreement. When the agreement expired in 2003, the city of Bloomfield Hills and the township library did not renew it. As a result, city residents, including plaintiff, were allowed by the township only to visit the library and to use its materials on site. They were not allowed to borrow library materials or to fully access online databases and other programs, services, and activities that were regularly available to township residents.
Plaintiff believed that, notwithstanding the lack of a service agreement between the township library and the city, the Michigan Constitution guaranteed availability to him and to all other state residents. Thus, he felt he had the right to full use of the library and its collections, including borrowing privileges. Plaintiff sought a nonresident library card and offered to pay a borrowing fee. Pursuant to its local policies, the township library refused and asserted that the access it allowed was sufficient to meet the requirements of Const 1963, art 8, § 9.
Plaintiff brought an action seeking a declaratory judgment against the township library, demanding borrowing rights equivalent to those of a township resident on the basis that such rights are assured by Const 1963, *558 art 8, § 9. Anything less, plaintiff argued, such as that which was offered by the township — library access with no borrowing privileges — violated the constitutional guarantee. The township library argued to the contrary that, under Const 1963, art 8, § 9, there was no constitutional right to the unlimited access plaintiff sought, and that it could constitutionally enforce its policy.
The trial court granted summary disposition to the township library, ruling that, by allowing onsite use, the library satisfied the constitutional requirement that libraries be “available” to state residents. The Court of Appeals affirmed, agreeing that the availability requirement of Const 1963, art 8, § 9 created no constitutional mandate that libraries provide nonresident borrowing privileges or make all resident services accessible to nonresidents. 268 Mich App 642, 652; 708 NW2d 740 (2005). After hearing oral argument on plaintiffs application for leave to appeal, this Court granted leave to appeal. 477 Mich 919 (2006).
II. STANDARD OF REVIEW
This Court reviews de novo a trial court’s decision granting or denying a motion for summary disposition. City of Taylor v Detroit Edison Co, 475 Mich 109, 115; 715 NW2d 28 (2006). Issues of constitutional construction are questions of law that are also reviewed de novo. Id. When interpreting constitutional provisions, our primary objective “ ‘is to realize the intent of the people by whom and for whom the constitution was ratified.’ ” Studier v Michigan Pub School Employees Retirement Bd, 472 Mich 642, 652; 698 NW2d 350 (2005), quoting Wayne Co v Hathcock, 471 Mich 445, 468; 684 NW2d 765 (2004). That is, we seek the “ ‘common understanding’ ” of the people at the time the constitution was ratified. Studier, supra at 652, quoting 1 Cooley, Con *559 stitutional Limitations (6th ed), p 81 (citations and internal quotation marks omitted). This involves applying the plain meaning of each term used at the time of ratification, unless technical, legal terms are used. Studier, supra at 652.
III. ANALYSIS
A. CONST 1963, ART 8, § 9
Const 1963, art 8, § 9 states:
The legislature shall provide by law for the establishment and support of public libraries which shall be available to all residents of the state under regulations adopted by the governing bodies thereof.
Defendant argues that a public library is “available” for purposes of our constitution when it is subject to entry and its resources subject to use on site. We disagree. Instead, we agree with plaintiff that a public library is only “available” when a person enjoys reasonable borrowing privileges. In particular, we agree with plaintiff that, in construing our constitution, “available” must be assessed specifically in conjunction with “public libraries.” Although this may not necessarily be true with regard to research libraries or private libraries, we believe that the “common understanding” is that “public libraries” are only “available” to a person if he has reasonable borrowing privileges.[2]
However, we disagree with plaintiffs premise that Const 1963, art 8, § 9 requires that each individual public library facility in Michigan must be “available” *560 on identical terms to all residents of the state. Rather than addressing the obligations of individual library facilities, this provision is better understood, in our judgment, as assuring the availability of public libraries in general.[3] That is, the Legislature shall make public libraries available, not necessarily each individual library facility. Const 1963, art 8, § 9 does not refer to “each and every” public library or to “individual” public library facilities, but refers only to the legislative obligation to provide for the “establishment and support of public libraries.” By this use of the plural, as well as the use of the broad terms “establishment and support,” we believe that the constitution refers to “public libraries” as an entity, i.e., public libraries as an institution. It is this entity, this institution — the public library — that must be made “available” to all residents, not each individual library facility.[4]
*561 By way of example, the very same article of the constitution states that, “[r]eligion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.” Const 1963, art 8, § 1. Such “encourage[ment]” of schools, to continue “forever,” does not, we believe, prohibit the cities of Detroit or Saginaw, for example, from ever closing an underutilized or an out-of-date school, for individual school facilities are simply not the subject of this provision. Rather, it is schools as an entity, as an institution, that must “forever be encouraged.”[5] Likewise, in Const 1963, art 8, § 9, it is not each individual library facility that must be made available, but rather public libraries as an entity or as *562 an institution that must be made available.
And this is precisely what the Legislature has done. Acting pursuant to its constitutional obligation to “provide by law for the establishment and support of public libraries which shall be available to all residents of the state,” the Legislature has enacted numerous laws.[6] The premise of these laws appears to be that the mandate of the constitution can best be achieved by (a) the encouragement of local control of public libraries[7] and (b) the establishment of a system in which communities with public libraries can enter into agreements with communities without public libraries in order to extend access to such libraries.[8]
*563 By these principles — local control and the encouragement of interjurisdictional agreements — the Legislature has sought to satisfy its constitutional obligations by incentivizing communities both to build and to maintain libraries and to extend their availability to communities that lack a library. Had the Legislature acted unwisely in the adoption of these principles, it nonetheless would be entitled to considerable deference from this Court, for it is the Legislature explicitly that has been given primary responsibility by the constitution for the “establishment and support of public libraries.” However, it seems clear that the Legislature, with the support of the public library community, has acted wisely.
Justice CAVANAGH acts considerably less wisely in seeking to substitute his own judgment for that of the *564 Legislature. He would undo the incentives enacted by the Legislature for the establishment and maintenance of public libraries. He would disincentivize communities from building libraries by making them identically available to persons who had and who had not paid for them; he would disincentivize communities from maintaining libraries by making improvements and new accessions identically available to persons who had and who had not paid for them; he would disincentivize non-library communities from entering into cooperative agreements with library communities by allowing persons to enter into individual agreements; and he would deprive library communities of the revenues that would be lost as a result of the combination of these disincentives.[9]
*565 As a result, over time, Justice CAVANAGH would almost certainly produce an environment in which fewer new libraries are constructed, fewer new books are purchased, fewer cooperative agreements are reached, and local support of public libraries declines. Public libraries would become less, not more, available, although Justice CAVANAGH doubtless would take solace that every resident would have absolutely identical access to the dwindling and outworn libraiy resources of the state.
Pursuant to Const 1963, art 8, § 9, it is the Legislature that is empowered to exercise judgments concerning how to “provide by law for the establishment and support of public libraries.” Although Justice CAVANAGH is free to disregard economic realities and to ignore the logic of incentives and disincentives, the Legislature is not obligated to proceed along these same lines. The Legislature, altogether reasonably we believe, has determined that the “availability” of public libraries is best achieved through the institutions of local control and the encouragement of cooperative agreements. We defer to this judgment.
Indeed, it appears from statistics offered by the Michigan Department of Histoiy, Arts and Libraries that less than % of 1 percent of the population of Michigan does not have a public libraiy available either directly through their communities or through a cooperative agreement.[10] *566 This is to be contrasted with the history of the predecessor provision to Const 1963, art 8, § 9, which mandated that the Legislature establish public libraries in every township and city. After 125 years of such a mandate in 1962, a public library had been established in only 7 percent of the cities and townships of Michigan.[11] Particularly against this historical backdrop, the Legislature’s judgment that public libraries can best be made available by encouraging local control and cooperative agreements, and thereby incentivizing their “establishment and support,” appears to be an entirely reasonable and responsible judgment that should not be upset by this Court.[12]
*567 B. OTHER CONSTITUTIONAL ARGUMENTS
Plaintiff also argues that the township library’s policy of not offering nonresident book-borrowing privileges violates his First Amendment “right to receive information” under the United States Constitution[13] and his right not to be deprived of “the equal protection of the laws” under the United States and Michigan constitutions.[14] We disagree.
Plaintiff cites four cases to support his argument that the township library’s policy of not offering nonresident book-borrowing privileges violates the First Amendment. The first case — Martin v City of Struthers, 319 US 141; 63 S Ct 862; 87 L Ed 1313 (1943) — held that a municipal ordinance that prohibited people from knocking on doors to distribute leaflets violated the First Amendment. The second case — Griswold v Connecticut, 381 US 479; 85 S Ct 1678; 14 L Ed 2d 510 (1965) — held that a state statute prohibiting the use of contraceptives violated the right of marital privacy. The third case — Kreimer v Morristown Bureau of Police, 958 F2d *568 1242 (CA 3, 1992) — held that a public library’s rule prohibiting disruptive behavior and offensive bodily hygiene did not violate the First Amendment. The fourth case — Salvail v Nashua Bd of Ed, 469 F Supp 1269 (D NH, 1979) — held that a school board’s removal of a certain magazine from the library based on its content violated the First Amendment. First, we must note that we are, of course, not bound by either Kreimer or Salvail. Abela v Gen Motors Corp, 469 Mich 603, 606; 677 NW2d 325 (2004). Second, and most importantly, not one of the cases that plaintiff cites held, or even remotely suggested, by implication or otherwise, that the First Amendment requires a public library to offer nonresident book-borrowing privileges.
The most relevant case cited is Kreimer, supra at 1255, which merely held that the First Amendment protects “the right to some level of access to a public library.” In this case, the township library indisputably allows nonresidents “some level of access to a public library.” Therefore, even under Kreimer — the most relevant and the most favorable case that plaintiff has cited in support of his argument, although we emphasize again not a case that is controlling or that has been adopted in this state — it is clear that a township library’s policy of not offering nonresident book-borrowing privileges does not violate the First Amendment.
Plaintiffs equal protection challenge likewise fails. Plaintiff alleges no discrimination here based on race, national origin, ethnicity, gender, or illegitimacy. Accordingly, this Court applies a “rational basis” analysis.[15] See, e.g., Crego v Coleman, 463 Mich 248, 259-260; *569 615 NW2d 218 (2000). Under such an analysis, “courts will uphold legislation as long as that legislation is rationally related to a legitimate government purpose.” Id. at 259. In order to have a law declared unconstitutional, a challenger must demonstrate that it is arbitrary and that the law is “ ‘wholly unrelated ... to the objective of the statute.’ ” Id., quoting Smith v Employment Security Comm, 410 Mich 231, 271; 301 NW2d 285 (1981). No showing of this sort is possible here. The purpose of the township library’s residency requirement is to create a viable means of establishing and maintaining a local public library; it is a means consistent with the Legislature’s constitutional direction to make public libraries available to the residents of this state. For the reasons discussed in this opinion, the library’s regulations are a reasonable way to achieve its purpose, and, thus, there is no equal protection violation.
IV CONCLUSION
Const 1963, art 8, § 9 does not require each and every individual public library facility in Michigan to offer nonresident book-borrowing privileges. Accordingly, we affirm the Court of Appeals decision affirming summary disposition for the township library.
Taylor, C. J., and Corrigan and Young, JJ., concurred with MARKMAN, J.

 The term “nonresident” is used throughout this opinion to refer to a person who is a resident of the state of Michigan, but not a resident of the municipality having the library from which that person desires to borrow books.

 Although Justice Cavanagh agrees with us that public library “availability” encompasses book borrowing, he criticizes us for not adequately explaining why this is so. Post at 571 n 1. Given this view, it is curious that he would provide absolutely no explanation of his own for why he agrees with us in this regard.

 Justice Cavanagh describes us as holding that as long as libraries are “ ‘generally’ available,” see, e.g. post at 570, art 8, § 9 is satisfied. In so doing, he mischaracterizes this opinion. We do not hold that “general” availability satisfies the constitution. Instead, we hold that “availability” must be understood in terms of the public library as an institution rather than in terms of each individual library facility.

 Justice Cavanagh criticizes us for ignoring the “common understanding” of the ratifiers. See post at 575. More accurately, we simply disagree with Justice Cavanagh concerning such “common understanding.” He points to nothing occurring at the constitutional convention, nothing communicated by the convention, and nothing understood by the people in ratifying the product of the convention that supports his interpretation of the “common understanding.” Indeed, much of what Justice Cavanagh cites from the debates, if not altogether irrelevant, affirmatively supports our position. See, e.g., post at 577, quoting 1 Official Record, Constitutional Convention 1961, at 822 (“ ‘The committee presumes that legislation may be written so that each library may make reasonable rules for the use and control of its books. . .. [T]o make libraries more available to the people their services may be expanded through cooperation, consolidation, branches and bookmobiles.’ ”); post at 578 n 2, citing 1 Official Record, Constitutional Convention 1961, at 835 (“The committee conveyed that it was the Legislature’s place to *561 legislate the details.”). Because we believe that the actual language of the proposed constitution constitutes the best evidence of the “common understanding,” Studier, supra at 652, we rely on this language. Considering this language (as well as the circumstances that necessitated modification of the “library provision” of the former constitution, see n 11 of this opinion), we do not believe that the ratifiers understood Const 1963, art 8, § 9 to require each individual library facility to allow each resident of the state to borrow books — regardless of all other considerations, including the impact of such a policy on communities’ incentives to establish and maintain local public libraries.
Justice Cavanagh approvingly cites the amid curiae briefs and the affidavits of two former constitutional convention delegates. However, just as this Court is not bound by what individual members of the Legislature subsequently state was the specific intent behind a particular statute, Bd of Ed of Presque Isle Twp School Dist No 8 v Presque Isle Co Bd of Ed, 364 Mich 605, 611-612; 111 NW2d 853 (1961), we are not bound by what two of 144 convention delegates state 45 years after the fact was the specific intent behind a particular constitutional provision. Indeed, this stricture is even more true with respect to a constitutional provision than a statute because it is not the intent of the delegates that is controlling, but the intent of the ratifiers — “we the people.”

 See also Const 1963, art 8, § 8 (“Institutions, programs and services for the. care, treatment, education or rehabilitation of... [the] disabled shall always be fostered and supported.”). Does this provision truly require that no individual “institution, program or service” can ever be eliminated or replaced, or does it simply establish a constitutional policy of encouraging such “institutions, programs and services”?

 Justice Cavanagh criticizes us for considering “later-enacted legislation” to modify the meaning of “available.” Post at 570. More accurately, we look to “later-enacted legislation” as evidence that the Legislature has fulfilled its constitutional obligation to provide for the “establishment and support of public libraries.” Ironically, Justice Cavanagh himself looks to both “later-enacted legislation” and “later-issued” Attorney General opinions. Post at 581-584.
We agree with Justice Cavanagh that it is not for the Legislature to ultimately determine the meaning of “available” under art 8, § 9. See post at 573. Rather, after the Legislature and the governing bodies of the libraries have established rules for availability (as they have done here), the courts must ultimately determine whether what they have done meets the constitutional standard of availability under art 8, § 9.

 See MCL 397.206 (“Every [municipal] library... shall be forever free to the use of the inhabitants where located.”); MCL 397.301 (stating that “any county shall have the power to establish a public library free for the use of the inhabitants of such couniy... with the body having control of such library, to furnish library service to the people of the county”); MCL 397.561a (“A library may charge nonresident borrowing fees to a person residing outside of the library’s service area, including a person residing within the cooperative library’s service area to which that library is assigned, if the fee does not exceed the costs incurred by the library in making borrowing privileges available to nonresidents including, but not limited to, the costs, direct and indirect, of issuing a library card, facilitating the return of loaned materials, and the attendant cost of administration.”).

 MCL 397.301 (stating that “any county... may contract for the use ... of a public library already established within the county”); MCL *563 397.213(1) (stating that “a township, village, or city adjacent to a township, village, or city that supports a free public circulating library ... may contract for the use of library services with that adjacent township, village, or city”); MCL 397.214(2) (stating that “the library board of directors of a township, city, or village supporting and maintaining a free public circulating library ... may enter into a contract with another township, city, or village to permit the residents of that other township, city, or village the full use of the library)”; MCL 397.216 (“After fulfilling the contractual requirements, the people of a township, village, or city which has contracted for library services with another township, village, or city shall have all rights in the use and benefits of the library that they would have if they lived in the township, village, or city where the library is established.”); MCL 397.555 (“To be eligible for membership in a cooperative library, a local library shall... (d) Maintain an open door policy to the residents of the state, as provided by section 9 of article VIII of the state constitution of 1963.”); MCL 397.561 (“Following establishment of a cooperative board, residents of the cooperative library's area are eligible to use the facilities and resources of the member libraries subject to the rules of the cooperative library plan. Services of the cooperative library, including those of participating libraries, are to be available at reasonable times and on an equal basis within the areas served to schoolchildren, individuals in public and nonpublic institutions of learning, and a student or resident within the area.”).

 Indeed, although he skirts the question, Justice Cavanagh, by apparently requiring library communities to subsidize nonresidents entering into individual agreements, would incentivize such agreements while disincentivizing cooperative agreements. He skirts this question by failing to make clear what amount Mr. Goldstone could be required to pay the Bloomfield Township library for his new “constitutional right” of borrowing privileges. Does Justice Cavanagh agree with Delegate Higgs, whom he quotes, post at 579, that no charges at all could be imposed under the constitution for this privilege? Does Justice Cavanagh agree with plaintiff himself that the library could not recoup the “indirect” costs of taxation that are borne by citizens of Bloomfield Township for their library? On these and related questions, Justice Cavanagh uncharacteristically defers to the Legislature to “sortG out [the] financial details.” Post at 578. Thus, he avoids addressing what is at the heart of plaintiffs argument, namely that nonresidents are constitutionally entitled to identical library privileges as residents, and at a significantly lower cost than borne by residents. That is, nonresidents are entitled to identical library privileges subsidized by the taxpayers of another community. This anomalous result is not compelled by Const 1963, art 8, § 9, and further highlights the transformation of state library policy, and the distorted incentives, that Justice Cavanagh would institute.
Justice CAVANAGH simply makes no sense on the issue of fees. At one point, he states, “I offer no opinion regarding whether... fees are *565 permitted,” post at 585 n 6, yet at another point, he states, “libraries can protect themselves from the financial ruin the majority predicts simply by exercising their rights to charge a fee for nonresident book borrowing ....” Post at 580 n 4. At yet another point, he asserts that it is the “Legislature’s place to legislate the details,” post at 578 n 2, but then criticizes us for commenting on the incentives and disincentives that the Legislature must have weighed in carrying out its constitutional obligation to “provide by law for the establishment and support of public libraries.” Post at 586-587.

 The department asserts that there are only 21 townships in Michigan with a population totaling 17,055 that do not have a library and that do *566 not contract with another city or township for library services. Inexplicably, the department does not indicate how many cities are similarly lacking. Although we cannot imagine that this figure is very high, Bloomfield Hills obviously is one such city.

 In 1963, there were “over a million [Michigan residents that] ha[d] no access to public libraries.” Cushman, Libraries in the proposed new state constitution, 29 Michigan Librarian 1, 4 (1963).
Perhaps more than anything, it is this hard fact — the relatively modest success of the predecessor provision in ensuring public library access to the people of Michigan — that explains the majority’s and Justice Cavanagh’s different understandings of the significance of the “circumstances” surrounding the ratification of Const 1963, art 8, § 9. Contrary to his assertion, we do not “ignore” these circumstances; we simply interpret them differently than he does. The predecessor provision mandated that the Legislature establish public libraries in every township and city. Justice CAVANAGH argues that it is illogical to believe that the citizens of Michigan would willingly give up the constitutional guarantee of a library in their own township or city for a constitutional guarantee of public libraries in general being made available. Post at 591. However, the Address to the People accompanying Const 1963, art 8, § 9, observed that the predecessor provision “has never been adhered to as a matter of practice.” 2 Official Record, Constitutional Convention 1961, p 3397. We believe that it is entirely “logical” that the people would relinquish an illusory and unrealistic “right” in order to achieve a reality of greater library access. And history in this regard has proven the people right.

 Justice CAVANAGH presents us with several questions. First, “[o]n what basis is the majority’s conclusion reached”? Post at 572. Our *567 conclusion is reached on the basis of the language of Const 1963, art 8, § 9 and the circumstances surrounding the change in language from its predecessor provision. Second, “why does the majority rely only on its ‘belief of what the provision means, rather than on its belief of what the people believed it meant?” Post at 572. What we “believe” the provision to mean and what we believe that the people “believed” it to mean are one and the same, and Justice CAVANAGH cites nothing to suggest that the people believed it to mean something else or that they had a contrary “common understanding.” Finally, “[wjhat exactly are ‘generally available’ libraries?” Post at 572 (emphasis in the original). Again, we do not hold that each individual library facility must be “generally available.” Rather, we hold that public libraries in general must be available. See n 3 of this opinion.

 We must emphasize once again, see n 9, that the right asserted by plaintiff is better characterized as the “right to receive information subsidized by the taxpayers of another community.”

 US Const, Am I; Const 1963, art 1, § 2; US Const, Am XIV

 The rules governing the interpretation of statutes apply with equal force to the interpretation of local ordinances. See, e.g., Gora v City of Ferndale, 456 Mich 704, 711; 576 NW2d 141 (1998).