YOUNG, C.J.
Plaintiffs are several unions that represent employees in the state classified civil service. Their members are the beneficiaries of and participants in Michigan’s retirement system established under the State Employees’ Retirement Act (SERA).[1] SERA was enacted in 1943 and has been amended many times since. Plaintiffs challenge the most recent SERA *316 amendment, 2011 PA 264. They contend that, because 2011 PA 264 increases the cost and reduces the accumulation of future pension benefits previously recognized, it unconstitutionally infringes the exclusive constitutional powers of the Civil Service Commission (commission) to manage and oversee the civil service system. The commission has never formally opposed or attempted to repudiate the application of SERA or any of its several amendments, including 2011 PA 264, to the employees of the state classified civil service.
While the commission has considerable constitutional powers to manage the civil service system and to preserve its sphere of constitutional authority, the commission has no legislative powers. It may neither enact legislation nor revise an enactment, nor may it dictate that the Legislature repeal or modify an enactment. Therefore, we hold that because the commission has acquiesced in the application of SERA to the employees of the civil service system, plaintiffs objections fail to establish a basis for relief.
We reverse the judgment of the Court of Appeals and remand to the Court of Claims for further proceedings consistent with this opinion.
I. FACTS
A. BACKGROUND
In 1940, through an initiative petition, the people of Michigan ratified a constitutional amendment establishing a state civil service system.[2] Const 1908, art 6, § 22 became effective on January 1,1941, and provided in part:
*317 The commission shall classify all positions in the state civil service according to their respective duties and responsibilities, fix rates of compensation for all classes of positions, approve or disapprove disbursements for all personal services, determine by competitive performance exclusively on the basis of merit, efficiency and fitness the qualifications of all candidates for positions in the state civil service, make rules and regulations covering all personnel transactions, and regulate all conditions of employment in the state civil service. No person shall be appointed to or promoted in the state civil service who has not been certified as so qualified for such appointment or promotion by the commission. No removals from or demotions in the state civil service shall be made for partisan, racial, or religious considerations.
The administration of the commission’s powers shall be vested in a state personnel director who shall be a member of the state civil service and who shall be responsible to and selected by the commission after open competitive examination.
Shortly after its creation, the commission promulgated a rule requiring its state personnel director to recommend that the Legislature establish a retirement plan for classified employees:
RETIREMENT. The director, in conjunction with appointing authorities, other supervising officials, the state budget director and members of the legislature, shall prepare and submit to the commission for approval and subsequent recommendation to the governor and the legislature for adoption by law, a comprehensive and workable contributory retirement system for employees in the state civil service.1[3]1
Apparently, the commission thereafter designed a model retirement plan, which it submitted to the Governor for comment. However, before the Governor *318 completed his review of the commission’s plan,[4] the precursor to SERA was introduced in the House of Representatives as House Bill No. 177.[5] SERA was signed into law as 1943 PA 240, and was codified as MCL 38.1 et seq.
Subsequently, the people ratified a new Constitution in 1963, which altered somewhat the way that the commission operates. Const 1963, art 11, § 5, ¶ 4, remains largely unchanged from Const 1908, art 6, § 22, and provides in relevant part:
The commission shall classify all positions in the classified service according to their respective duties and responsibilities, fix rates of compensation for all classes of positions, approve or disapprove disbursements for all personal services, determine by competitive examination and performance exclusively on the basis of merit, efficiency and fitness the qualifications of all candidates for positions in the classified service, make rules and regulations covering all personnel transactions, and regulate all conditions of employment in the classified service.[6]
In the same section, however, the ratifiers introduced a new legislative check on compensation increases for civil servants authorized by the commission:
Increases in rates of compensation authorized by the commission maybe effective only at the start of a fiscal year *319 and shall require prior notice to the governor, who shall transmit such increases to the legislature as part of his budget. The legislature may, by a majority vote of the members elected to and serving in each house, waive the notice and permit increases in rates of compensation to be effective at a time other than the start of a fiscal year. Within 60 calendar days following such transmission, the legislature may, by a two-thirds vote of the members elected to and serving in each house, reject or reduce increases in rates of compensation authorized by the commission. Any reduction ordered by the legislature shall apply uniformly to all classes of employees affected by the increases and shall not adjust pay differentials already established by the civil service commission. The legislature may not reduce rates of compensation below those in effect at the time of the transmission of increases authorized by the commission.1[7]1
Following the ratification of the 1963 Constitution, the commission replaced its initial retirement rule, Rule XXXVIII, but its replacement did not purport to fundamentally change the commission’s advisory role in SERA’s administration:
Section 31 — Retirement.
31.1 Cooperation With State Retirement Board. —
The state personnel director shall cooperate with the State Employees’ Retirement Board in maintaining a comprehensive contributory retirement system for state civil service employees.1[8]1
The commission’s rules have remained substantively unchanged in this regard.[9]
*320 B. 2011 PA 264
In 2011, the Legislature amended SERA.[10] Relevant to the instant case are the amendments of MCL 38. le, MCL 38.35a, and MCL 38.50a. Broadly speaking, the amendments (1) potentially reduce the value of overtime compensation as it factors into a member’s pension formula for future benefits,[11] and (2) require members to make an election between paying to remain in a defined benefit plan (that was previously free), or instead joining a “Tier 2,” 401(k)-style defined contribution plan.[12]
*321 II. PROCEDURAL HISTORY
Plaintiffs argue that SERA retirement benefits are “rates of compensation” or, alternatively, “conditions of employment,” as these terms are used in Const 1963, *322 art 11, § 5. Accordingly, plaintiffs claim, SERA retirement benefits are not subject to legislative change because the regulation of “rates of compensation” and “conditions of employment” of employees in the classified civil service is within the exclusive and plenary authority of the commission.
The Court of Claims held that 2011 PA 264 was unconstitutional. The Court of Appeals affirmed the ruling of the Court of Claims, concluding that SERA retirement benefits are properly classified as both “rates of compensation” and “conditions of employment,” neither of which is subject to legislative alteration.[13] The state appealed and we granted leave, directing the parties to brief “whether 2011 PA 264 is unconstitutional, in whole or in part, in violation of Const 1963, art 11, § 5.”[14]
III. STANDARD OF REVIEW
This Court reviews the grant or denial of summary disposition de novo.[15] Questions of constitutional and statutory interpretation also are reviewed de novo.[16]
IV. ANALYSIS
As noted, plaintiffs make two alternative arguments that by enacting 2011 PA 264, the Legislature infringed the commission’s constitutional authority. First, plaintiffs allege that the pension accrual characteristics altered by 2011 PA 264 affect classified employees’ “rates of compensation” under Const 1963, art *323 11, § 5, and that the Legislature cannot act in that area. Second and in the alternative, plaintiffs allege that the pension accrual characteristics affected by 2011 PA 264 are “conditions of employment” under Const 1963, art 11, § 5. We address these two arguments in turn.
A. “RATES OF COMPENSATION”
As used in Article 11, § 5, we conclude that the term “rates of compensation” was not understood by the ratifiers of the 1963 constitution to include fringe benefits such as pensions; rather, the common understanding of the term at that time was that it included only salaries and wages.
Our primary goal in construing a constitutional provision is to give effect to the intent of the people of the state of Michigan who ratified the Constitution, by applying the rule of “common understanding.”[17] We locate the common understanding of constitutional text by determining the plain meaning of the text as it was understood at the time of ratification.[18] Interpretation of a constitutional provision also takes account of “the circumstances leading to the adoption of the provision and the purpose sought to be accomplished.”[19] The Address to the People, which was dis *324 tributed to Michigan citizens in advance of the ratification vote and which explained in everyday language what each provision of the proposed new Constitution was intended to accomplish,[20] and, to a lesser degree, the constitutional convention debates are also relevant to understanding the ratifiers’ intent.[21]
Textual indicators in the Constitution uniformly indicate that the phrase “rates of compensation,” as used in Article 11, § 5, was commonly understood to include only salaries and wages, i.e., amounts paid out to employees in a paycheck.[22] For instance, Article 11, § 5 only reserves to the commission the authority to “fix rates of compensation,” rather than “compensation” generally. In the context of compensation for one’s employment-related services, “rate” was defined as “a wage paid on a specified time basis: a salary figured on an hourly rate.”[23] “Wages,” in turn, was defined as *325 “money that is paid or received for work or services, as by the hour, day, or week”[24]
This understanding is confirmed elsewhere. Highly significant to our assessment is the Address to the People. Apart from the text of the Constitution itself, the Address provides an authoritative contemporary construction of the constitutional provisions that the citizens of Michigan were asked to vote on.[25] The Address confirms that “rates of compensation” did not include fringe benefits such as pensions. As previously stated, the current ¶ 7 of Article 11, § 5 gives the Legislature a supermajority veto over the commission’s proposed changes to “rates of compensation.” The Address explains that this provision “provides for limited legislative control of wage increases under specified circumstances.”[26] The Address alternatively explains the same legislative control as pertaining to “the total level of state payroll[.]”[27] “Compensation” was thus directly understood as the money employees received in their paychecks.
Moreover, the portion of the Address explaining Article 11, § 5 states: “Of special interest to civil service personnel is the provision in Sec. 24, Article IX, of the proposed constitution which specifies that pension plans and retirement systems of the state shall be contractual obligations ‘which shall not be diminished *326 or impaired.’ ”[28] The ratifiers were thus aware of the special independent status of pensions created for civil servants, as well as the new obligation imposed to protect any such pensions. This portion of the Address is especially noteworthy because, in discussing ¶ 4 of Article 11, § 5, the Address directs the ratifiers’ attention elsewhere to the provisions of Article 9, § 24 that expressly discuss pensions, while simultaneously equating “rates of compensation” with wages. We conclude that this explanation confirms our textual construction based on the common understanding of “rates of compensation.”
Finally, although of lesser import than the Address, the transcript of the constitutional convention debates further confirms that the common understanding of “rates of compensation” did not extend to pensions. The record is replete with references to “wages” and “salaries” during discussion of the Legislature’s then-proposed veto power over commission increases to “rates of compensation,”[29] and there are no relevant references to “pensions” or “retirement.”
In conjunction with the text of Article 11, § 5 discussed earlier, these historical sources confirm that the *327 phrase “rates of compensation” referred to salaries and wages as opposed to fringe benefits such as the SERA pension program. Accordingly, we find no merit in plaintiffs’ argument that 2011 PA 264 infringes the commission’s authority to regulate “rates of compensation,” because the SERA pension program does not affect “rates of compensation” as that term is used in Const 1963, art 11, § 5.
Notably, 2011 PA 264 does nothing to change the member’s salary or wages.[30] With regard to overtime, 2011 PA 264 does not affect the availability of overtime, or the rate at which overtime is paid; it only affects how overtime factors into a member’s pension formula.[31] Accordingly, because 2011 PA 264 does not affect “rates of compensation” by requiring changes to wages or salaries, it does not implicate the commission’s constitutional authority over classified civil servants’ “rates of compensation.”
B. "CONDITIONS OF EMPLOYMENT”
As an alternative to their argument that SERA pensions are “rates of compensation,” plaintiffs allege that SERA pensions are “conditions of employment.” They further allege that, as a result, any legislative action in the field of pensions requires commission approval in order to be constitutional. Plaintiffs also appear to allege that SERA was itself an “exercise” of commission authority.[32] For the limited purpose of this *328 case, we assume without deciding that a pension is a “conditionQ of employment” as used in ¶ 4 of Const 1963, art 11, § 5. Furthermore, for the limited purpose of this case, we also assume without deciding that the commission’s authority under Article 11, § 5 to “regulate all conditions of employment” includes the authority to establish, maintain, and amend a pension plan.[33] Regardless, we hold that the commission has no authority to prevent the Legislature from enacting 2011 PA 264 any more than it had authority to compel the enactment of SERA itself because either act would constitute an unconstitutional exercise of legislative authority.
1. THE COMMISSION LACKS POWER TO ENACT OR REVISE LEGISLATION
“The powers of government are divided into three branches: legislative, executive and judicial.”[34] Although the commission is constitutionally created, and its proper functions are therefore constitutionally in *329 violable, the commission’s authority is part of the executive branch power.[35] The commission “is vested with plenary powers in its sphere of authority.”[36] Just as “any executive, legislative or judicial attempt at incursion into that ‘sphere’ would be unavailing,”[37] the commission itself may not act outside the bounds of its authority.[38] The Legislature—responsible for creating 2011 PA 264—and the commission are each constitutionally precluded from exercising the powers of the other: “No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in [the] constitution.”[39]
It scarcely bears repeating that the executive power cannot be used to enact actual statutes. That power is *330 vested exclusively in the Legislature.[40] Likewise, the commission cannot mandate certain appropriations relating to conditions of employment, because the appropriative power also resides in the Legislature.[41] That said, it is true that the separation of powers doctrine does not rigidly confine all powers of a certain character to one branch or another. One branch of government may have authority of a character typically associated with another branch, as long as the Constitution “explicitly” grants that authority.[42] A compelling example in this context is Const 1963, art 11, § 5, ¶ 7, which provides the commission with the express authority to increase rates of compensation. Such increased rates must be included within the budget submitted by the Governor and are subject only to the supermajority veto of the Legislature. This is a singular, if limited, nonlegislative power to allocate taxpayer funds. This explicitly granted power stands in contrast to the absence of such power with respect to regulating conditions of employment. Article 11, § 5 cannot bear an interpretation that the ratifiers allocated any legislative or appropriative authority to the commission to regulate “conditions of employment.” Whatever the bounds of the commission’s authority to *331 increase rates of compensation, the Constitution gives the commission no comparable power to expend taxpayer funds in connection with its power to “regulate conditions of employment.”
By the same logic, the commission has no explicit authority to require the Legislature to exercise its lawmaking power in the field of “conditions of employment.” Under plaintiffs’ interpretation of the constitutional provision at issue, the commission’s power in this area would be so limitless as to include the authority for it to dictate the nuances of statutory schemes. Plaintiffs’ argument that the commission has such authority must fail. Instead, when the commission wishes to regulate “conditions of employment,” it must proceed within its own sphere, using its own constitutionally provided tools, which it typically does by promulgating and enforcing its rules.
2. 2011 PA 264 DOES NOT VIOLATE THE COMMISSION’S CONSTITUTIONAL AUTHORITY
Based on the foregoing, we hold that SERA could not have been, and thus is not, a product that the commission could have created by exercising its proper constitutional authority. These principles are equally relevant in considering whether the Legislature has overstepped its bounds and intruded into the sphere of the commission’s constitutional responsibility. Unlike the federal Constitution, our Constitution is “not a grant of power to the Legislature, but is a limitation upon its powers.”[43] Therefore, the legislative authority of the state “can do anything which it is not prohibited *332 from doing by the people through the Constitution of the State or the United States.”[44]
The commission has plenary, exclusive authority to “regulate all conditions of employment in the classified service.”[45] As mentioned earlier, we assume without deciding that pensions are such “conditions of employment” and that the commission’s authority under Article 11, § 5 to “regulate all conditions of employment” includes the authority to establish, maintain, and amend its own pension plan.[46] We also assume without deciding that the commission’s Article 11, § 5 authority to “regulate all conditions of employment” is exclusive and not subject to the Legislature’s authority in Article 4, § 1 to exercise “[t]he legislative power of the State of Michigan” or its authority in Article 4, § 49 to “enact laws relative to . . . conditions of employment.” If that is the case, then SERA in its entirety is a legislative intrusion into the commission’s sphere of authority to “regulate all conditions of employment,” by virtue of the fact that it dictates an element of a condition of employment.[47] However, it is important to note that, in amending SERA by enacting 2011 PA 264, the Legislature has no more encroached upon the commission’s authority to regulate pensions than it had before the amendment.
*333 When confronted with a violation of the separation of powers, this Court has noted that it is permissible for one branch to acquiesce in the intrusion of another and thus avoid a constitutional conflict.[48] Here, the commission acquiesced in the Legislature’s presumed violation of the separation of powers when it made SERA applicable to civil servants in Rule 5-13, which provides that “[a] classified employee is eligible for retirement benefits as provided by law.”[49] And Rule 5-13, last amended effective March 18, 2001, was in place when the Legislature enacted 2011 PA 246. Thus, upon enactment, the amendment necessarily became *334 part of the “retirement benefits as provided by law” applicable to classified civil servants.
Furthermore, the dissent rightly states that “there is a meaningful difference between an assertion that the commission has the power to dictate what the Legislature enacts into law and an assertion that the commission is empowered to object to a legislative incursion into the commission’s sphere of authority.”[50] Here, both are occurring simultaneously, because plaintiffs object to the amended SERA and demand the reinstatement of the preamendment SERA. But that prior version of the law no longer exists.
We merely hold that the commission may adopt rules that acquiesce in a statute that allegedly intrudes on its sphere of authority, as it has here. What plaintiffs seek in this appeal appears to be beyond the power of the commission. The commission cannot decline to acquiesce by directing the Legislature to “revive” an act that no longer exists. And what the commission cannot constitutionally do directly, it cannot, through surrogates or otherwise, accomplish indirectly by resort to the judiciary.[51]
V. CONCLUSION
Const 1963, art 11, § 5 vests the Civil Service Commission with plenary authority to “fix rates of compen *335 sation” and “regulate all conditions of employment [.]” The Legislature, by 2011 PA 264, amended SERA, which provides pensions to state employees, including those in the classified civil service. 2011 PA 264 does not infringe the commission’s authority to “fix rates of compensation” because the ratifiers did not understand that phrase to include pensions or other fringe benefits. Likewise, when the commission acquiesces in the application of SERA to employees in the classified civil service, the presumed infringement of 2011 PA 264 presents no constitutional problem. The commission’s authority to regulate does not permit the commission to enact, amend, or maintain the laws of this state.
We reverse the Court of Appeals and remand to the Court of Claims for further proceedings not inconsistent with this opinion.
Markman, ZAHRA, and VIVIANO, JJ., concurred with YOUNG, C.J.

 MCL 38.1 et seq.

 For a discussion of the motivations behind the creation of the state civil service, see, e.g., Council No 11, AFSCME v Civil Serv Comm, 408 Mich 385, 397-401; 292 NW2d 442 (1980).

 Civ Serv R XXXVIII (1941) (emphasis added).

 The Governor’s letter to the commission’s state personnel director, dated February 18, 1943, acknowledged receipt of the commission’s proposed retirement plan on February 1, 1943, and noted that he was assigning someone to review the submissions who would communicate with the commission at a future date.

 House Bill 177 was dated February 15, 1943. It automatically included employees in the classified civil service, but also provided that “any state employee whose position is not included in the state civil service may become a member by filing a written notice .. ..” 1943 HB 177 at § 15(a).

 Emphasis added.

 Const 1963, art 11, § 5, ¶ 7 (emphasis added).

 Civ Serv R 31.1 (1963) (emphasis added).

 Civ Serv R 2-17.1 currently provides that “[t]he state personnel director shall cooperate with the state employees’ retirement board in maintaining a comprehensive retirement system for classified employees.” It was last amended effective April 29, 2004.

 See 2011 PA 264.

 As amended, MCL 38.1e(l) provides in part:
Beginning January 1, 2012, compensation used to compute final average compensation shall not include includable overtime compensation paid to the member on or after January 1, 2012, except that a member’s final average compensation that is calculated using any time period on or after January 1, 2012 shall also include, as prorated for the time period, the average of annual includable overtime compensation paid to the member during the 6 consecutive years of credited service ending on the same final date as used to calculate the final average compensation or, if the calculation date is before January 1, 2015, the average of the annual includable overtime compensation paid to the member on or after January 1, 2009 and before the final date as used to calculate the final average compensation.

 As amended, MCL 38.35a(l) provides in part:
Beginning with the first pay date after April 1,2012 and ending upon the member’s termination of employment or attainment date, as applicable under section 50a [MCL 38.50a], each member who made the election under section 50a shall contribute an amount equal to 4% of his or her compensation to the employees’ savings fund to provide for the amount of retirement allowance that is calculated only on the credited service and compensation received by that member after March 31, 2012. The member shall not contribute any amount under this subsection for any years of credited service accrued or compensation received before April 1, 2012. [Emphasis added.]
*321 As amended, MCL 38.50a provides in part:
(1) The retirement system shall permit each member who is a member on December 31, 2011 to make an election with the retirement system to continue to receive credit for any future service and compensation after March 31, 2012, for purposes of a calculation of a retirement allowance under this act. A member who makes the election under this section shall make the contributions prescribed in section 35a [MCL 38.35a].
[[Image here]]
(4) A member who does not make the election under this section or who rescinds an election on or before the close of the election period under this section is subject to all of the following:
(a) He or she ceases to receive credit for any future service and compensation for purposes of a calculation of a retirement allowance as prescribed in section 20j [MCL 38.20j], beginning 12 midnight on March 31, 2012.
(b) He or she becomes a qualified participant in Tier 2 beginning 12:01 a.m. on April 1, 2012.
(c) He or she shall receive a retirement allowance calculated under section 20 [MCL 38.20] that is based only on credited service and compensation allowed under section 20j(l) and (2). This subdivision does not affect a person’s right to health insurance coverage provided under section 20d [MCL 38.20d] or credit for service provided under section 20j(3).
(5) A member who makes the electwn under this section and the designation under subsection (2) and who does not rescind the election and designation on or before the close of the election period under this section is subject to all of the following:
(a) He or she ceases to receive credit for any future service and compensation for purposes of a calculation of a retirement allowance as prescribed in section 20j, beginning 12 midnight on the member’s attainment date.
(b) He or she becomes a qualified participant in Tier 2 beginning 12:01 a.m. on the day after the attainment date if he or she remains employed by this state.

 Mich Coalition of State Employee Unions v Michigan, 302 Mich App 187; 838 NW2d 708 (2014).

 Mich Coalition of State Employee Unions v Michigan, 495 Mich 921 (2014).

 Maiden v Rozwood, 461 Mich 109, 118; 597 NW2d 817 (1999).

 Hunter v Hunter, 484 Mich 247, 257; 771 NW2d 694 (2009).

 See Goldstone v Bloomfield Twp Pub Library, 479 Mich 554, 558-559; 737 NW2d 476 (2007) (“When interpreting constitutional provisions, our primary objective is to realize the intent of the people by whom and for whom the constitution was ratified. That is, we seek the ‘common understanding’ of the people at the time the constitution was ratified. This involves applying the plain meaning of each term used at the time of ratification, unless technical, legal terms are used.”) (citations and quotation marks omitted).

 Wayne Co v Hathcock, 471 Mich 445, 468-469; 648 NW2d 765 (2004).

 People v Tanner, 496 Mich 199, 226; 853 NW2d 653 (2014) (citation omitted).

 Walker v Wolverine Fabricating & Mfg Co, Inc, 425 Mich 586, 597; 391 NW2d 296 (1986) (stating that the Address “sought to explain each provision in terms the common person could understand”).

 Lapeer Co Clerk v Lapeer Circuit Court, 469 Mich 146, 156; 665 NW2d 452 (2003); see also Regents of the Univ of Mich v Michigan, 395 Mich 52, 60; 253 NW2d 1 (1975) (establishing that the Address to the People is superior to the constitutional convention debates as an interpretive tool).

 We acknowledge that, in isolation, the word “compensation” has a broad enough meaning to encompass pensions and other fringe benefits. See Random House Dictionary of the English Language, Unabridged Edition (1966) (defining “compensation” as “something given or received as an equivalent for services”), def 3. Other cases addressing “compensation” in other contexts, as well as the Court of Appeals below, recognize this. See, e.g., Kane v City of Flint, 342 Mich 74; 69 NW2d 156 (1955) (addressing municipalities’ authority to define pensions as compensation). However, we are here concerned with the entire phrase, “rates of compensation,” as that phrase is used in its constitutional context and as specifically understood by the ratifiers of our Constitution.

 Random House Unabridged Dictionary, def 11.

 Id., def 1 (emphasis added).

 See Univ of Mich Regents, 395 Mich at 60 (“The reliability of the ‘Address to the People’.. . lies in the fact that it was approved by the general convention on August 1,1962 as an explanation of the proposed constitution. The ‘Address’ also was widely disseminated prior to adoption of the constitution by vote of the people.”).

 Address to the People, 2 Official Record, Constitutional Convention 1961, p 3405 (emphasis added).

 Id. at 3359 (emphasis added).

 Id. at 3405.

 For example, one proponent of the amendment described “controlling abuses in a salary classification” as, “in other words, the right to fix compensation . ...” 1 Official Record, Constitutional Convention 1961, p 652. Regarding the phrase in Article 11, § 5 providing that “[t]he legislature may not reduce rates of compensation,” another delegate explained that this means that “the legislature is prohibited from reducing salaries . .. Id. at 640, quoting from the minority report of the committee on executive branch to Committee Proposal 22 (emphasis added); see also id. at 638 (‘Veto of wage determinations”; “control on the total number of dollars expended on salaries”), 639 (“wage rates”), and 664 (“salary fixing”) (emphasis supplied throughout); accord Rules of the Civil Service Commission, § 17 (1972) (entitled “Compensation of Employees” and speaking solely in terms of salaries).

 See MCL 38.50a and MCL 38.63. It is true that those who elect to pay for what was formerly a free benefit would pay that money from their salary, but that does not change the actual salary one earns.

 See MCL 38. le.

 See Plaintiff’s Brief on Appeal, p 18, quoting Hanlon v Civil Serv Comm, 253 Mich App 710, 717; 660 NW2d 74 (2002), to support the proposition that the “ ‘valid exercise’ ” of commission power cannot be *328 “ ‘taken away by the Legislature’ ” via 2011 PA 246; see also Plaintiffs Brief at 33 n 16 (asserting that the commission “voluntarily involved the Legislature” in creating SERA) (emphasis added). As explained, elsewhere in this opinion the notion that one branch of government can compel another to perform duties assigned to the second is a definitional violation of the separation of powers doctrine. Distinct from the method by which the commission regulates rates of compensation, which involves a budget communication with the Governor, the commission uses its Civil Service Rules as its primary means of regulating “conditions of employment.”

 Even assuming such a power, the commission, having no legislative power to appropriate funds that are not part of its discretionary administrative budget, would be unlikely to be able to fund any retirement program it might create.

 Const 1963, art 3, § 2; see also Civil Serv Comm v Auditor General, 302 Mich 673, 684; 5 NW2d 536 (1942) (stating that “set[ting] up, even in effect, a fourth department of government contravenes” the predecessor provision to Const 1963, art 3, § 2).

 Accord Straus v Governor, 459 Mich 526, 537; 592 NW2d 53 (1999) (“[T]he constitutional location of the [State Board of Education]⅛ functions within the executive branch is similar to that of.. . the Civil Service Commission, under Const 1963, art 11, § 5.”) (citation and quotation marks omitted).
The people added the original civil service amendment to Article VI of the 1908 Constitution, which article was entitled “Executive Department.” Today, by executive order, the commission has been made a part of the executive Department of Technology, Management, and Budget. See Executive Order No. 2009-55, effective March 21, 2010.

 Plec v Liquor Control Comm, 322 Mich 691, 694; 34 NW2d 524 (1948).

 Council No 11, 408 Mich at 408; see also Burton v Koch, 184 Mich 250, 257; 151 NW 48 (1915) (holding that the court, in determining the constitutionality of a statute, can only determine whether constitutional restrictions have been exceeded).

 See, e.g., Mich State AFL-CIO v Civil Serv Comm, 455 Mich 720, 733-734; 566 NW2d 258 (1997) (holding that the commission lacks the authority to define union leave as “actual duty” time, when in fact it is off-duty time not subject to commission regulation).

 Const 1963, art 3, § 2 (emphasis added); Judicial Attorneys Ass’n v Michigan, 459 Mich 291, 304; 586 NW2d 894 (1998) (“The doctrine of separation of powers is a shield for each of the branches of government . . . .”).

 Const 1963, art 3, § 2; Const 1963, art 4, § 1; see also Cameron v Auto Club Ins Ass’n, 476 Mich 55, 65; 718 NW2d 784 (2006) (“It is the legislators who establish the statutory law because the legislative power is exclusively theirs.”).

 See 46th Circuit Trial Court v Crawford Co, 476 Mich 131, 141; 719 NW2d 553 (2006) (opinion by Markman, J.) (“Perhaps the most fundamental aspect of the ‘legislative power’... is the power to tax and to appropriate for specified purposes.”).

 See Const 1963, art 3, § 2; Soap & Detergent Ass’n v Natural Resource Comm, 415 Mich 728, 752; 330 NW2d 346 (1982) (“[W]here .. . the constitution explicitly grants powers of one branch to another, there can be no separation of powers problem.”), citing Wood v State Admin Bd, 255 Mich 220, 224-225; 238 NW 16 (1931).

 Taxpayers of Mich Against Casinos v Michigan, 471 Mich 306, 327; 685 NW2d 221 (2004), quoting In re Brewster Street Housing Site, 291 Mich 313, 333; 289 NW 579 (1939) (quotation marks omitted).

 Id.., quoting Attorney General v Montgomery, 275 Mich 504, 538; 267 NW 550 (1936) (quotation marks omitted).

 Const 1963, art 11, § 5 (emphasis added); see also Council No 11, 408 Mich at 408, quoting Plec, 322 Mich 691.

 But see note 33 of this opinion.

 See Plec, 322 Mich at 694; Kent Co Prosecutor v Kent Co Sheriff, 425 Mich 718, 723; 391 NW2d 341 (1986); see also Gray v Clerk of Common Pleas Court, 366 Mich 588, 595; 115 NW 411 (1962) (stating that, because of the separation of powers, “[t]he courts cannot be hampered or limited in the discharge of their functions by either of the other 2 branches of government”).

 In Judicial Attorneys Ass’n, 459 Mich at 303, we noted that, although legislative commandeering of decisions related to judicial employment violated the separation of powers, “[t]he judicial branch may determine on its own authority, for practical reasons, to share with the legislative branch some limited employment-related decision making upon determining that such sharing is in the best interests of the judicial branch and the public as a whole.” We further recognized “the possibility that a court may choose to share decision making in a manner that resembles the scheme of [a statute violating the separation of powers] ....” Id.; see also McDougall v Schanz, 461 Mich 15, 27; 597 NW2d 148 (1999) (stating that the Legislature may not interfere with the Supreme Court’s exclusive, constitutional rulemaking authority “save as the Court may acquiesce and adopt for retention at judicial will”) (emphasis added), citing with approval Perin v Peuler (On Rehearing), 373 Mich 531, 541; 130 NW2d 4 (1964), which McDougall overruled on other grounds.
We are unpersuaded by Justice Bernstein’s attempt to diminish the relevance of Perin and McDougall to the instant case. His dissent would distinguish this Court’s rulemaking authority from the commission’s authority because this Court’s authority “extends only to matters of practice and procedure,” McDougall, 461 Mich at 27; by contrast, he argues, “there is no such limitation on the commission’s authority over conditions of employment... .” Post 350 (emphasis added). But the commission’s authority is no more “plenary” than this Court’s, as long as each is acting within its sphere of authority. “[T]he commission’s ‘sphere of authority’ delimits its rule-making power .. ..” Council No 11, 408 Mich at 408.

 Civ Serv R 5-13 (emphasis added).

 Post at 347-348.

 Finally, and as defendants point out, under Const 1963, art 4, § 49, “The legislature may enact laws relative to the hours and conditions of employment.” Defendants assert that this language grants the Legislature superseding authority over the commission on matters related to “conditions of employment.” However, because it is unnecessary to resolving this case, we decline to address this argument at this time and instead rest our holding on the conclusion that 2011 PA 264 does not violate the separation of powers or the authority of the commission while it chooses to accept SERA benefits for civil service employees.